IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BEVERLY E. ROBINSON, | ) | |
| Plaintiff, | ) | No. 06 C 5158 |
| v. | ) | |
| MORGAN STANLEY, et al., | ) | Magistrate Judge Jeffrey Cole |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

**A.**

Beverly Robinson's complaint has four claims against her former employer, Morgan Stanley: one for retaliatory discharge, one for alleged violations of the Illinois, Whistleblower Act, one for alleged violations of the Family and Medical Leave Act, and one for alleged violations of the Illinois Personnel Review Act. The present dispute involves a memorandum Ms. Robinson submitted when she was a Morgan Stanley internal auditor on February 5, 2004, in which she pointed out certain company practices and policies that she believed raised "legal risks." This, she claims, prompted Morgan Stanley to retaliate against her after she returned from medical leave, which she felt was, among other things, "a clear violation of the Family [and] Medical Leave Act," and "illegal." (*Memorandum of Law in Support of Defendants' Motion for Protective Order*, Ex. A, at 1, 23). Ms. Robinson's memorandum prompted Morgan Stanley to conduct a nearly three-month internal investigation into her charges. Its in-house counsel hired an outside consulting firm, the accounting firm KMPG, to oversee these efforts. According to Morgan Stanley, the investigative team found no evidence of fraud, malfeasance, or intentional misconduct.

Ms. Robinson wants to see the memorandum which, at the conclusion of the investigation, detailed its results. The Memorandum was authored by Bernice Jee, who worked in Morgan Stanley's human resources department. Morgan Stanley has moved for a protective order, contending that the memorandum and other documents relating to the investigation are protected from discovery under the attorney-client privilege and the work product doctrine.

**B.**

When Martin Slusarz, who then was CFO of Morgan Stanley's Discover Financial Services ("DFS"), received Ms. Robinson's February 5 memorandum, he called DFS's general counsel, Kelly McNamara-Corley. (*Memorandum of Law in Support of Defendants' Motion for Protective Order*, Ex. F, *Sarbanes-Oxley* Hearing Transcript, at 1571).[1] The two arranged to meet with Ms. Robinson the following morning. (*Id.,* at 187). Ms. McNamara-Corley promptly notified the Morgan Stanley audit review committee of the memo's complaint and sent them copies. (*Id.,* at 756-57). The review committee's purview includes investigations of possible whistleblower complaints. (*Id.,* at 757). DFS's general counsel advised the branch to proceed with a review committee investigation into the allegations in Ms. Robinson's memo.

The investigation team comprised employees from DFS's human resources, internal audit, and legal departments, as well as several independent experts from KPMG. (McNamara-Corley Dep., at 32). According to Ms. McNamara-Corley, KPMG was specifically hired to assist DFS's legal department in providing legal advice on how to respond to Ms. Robinson's allegations. (*Id.* at 32-33). David Oppenheim, in-house counsel at Morgan Stanley, directed the internal investigation

---

[1] The defendants rely rather extensively on the transcript of the Sarbannes-Oxley hearing for their version of the events.

into Ms. Robinson's allegations and oversaw KMPG's efforts. The investigation was intended to be and was kept strictly confidential. (*Memorandum of Law in Support of Defendants' Motion for Protective Order*, at 5; Ex. E, RX-19). Rocco deGrasse of KMPG testified that (1) he was retained by Mr. Oppenheim in his role as counsel; (2) Mr. Oppenheim directed the investigation and, more specifically, Mr. deGrasse and his team, all of whom reported to Mr. Oppenheim; (3) he reported his findings directly to Mr. Oppenheim, "the lawyer doing the investigation"; and (4) he worked "solely" for Mr. Oppenheim. (*Memorandum of Law in Support of Defendants' Motion for Protective Order*, Ex. G, deGrasse Dep., at 35).

The investigation spanned eleven weeks, and involved collecting and reviewing documents and interviewing witnesses, including Ms. Robinson on several occasions. (Ex. F at 1032-33). According to Mr. deGrasse, both Mr. Oppenheim and he specifically advised Ms. Robinson that all statements she provided during the interview fell within the protection of the attorney-client privilege, that the privilege belonged to the defendants and not Ms. Robinson, and that only they could choose to waive the privilege. (deGrasse Dep., at 32).[2] The defendants submit that the investigation failed to uncover any evidence of fraud, malfeasance, or intentional misconduct on the part of management or any employee who played a significant role with respect to internal controls. (Ex. F, at 1043-46). Although they found that several of Ms. Robinson's suggestions for improving internal controls had merit, she had previously communicated her suggestions to management and DFS had already responded to them or was in the process of doing so. (*Id.*). The investigation team

---

[2] Nonetheless, at my urging, Morgan Stanley agreed to turn over the notes of her interviews and it was agreed that the turnover would not be the basis for any claim of waiver as to the interviews of any other Morgan Stanley employee.

3

also investigated Ms. Robinson's complaints about FMLA violations and retaliation, and found no merit to those complaints. (*Id.* at 224-26).

When the investigation concluded in early May of 2004, Mr. Oppenheim met with Ms. Robinson and summarized the results of the investigation orally. (Ex. F, at 222-27, 1044-46). Ms. Robinson was told that the findings of the investigation team were confidential and protected by the attorney-client privilege and the attorney work product doctrine, and that therefore they would not reveal them to her.

The defendants have submitted the Memorandum from Ms. Jee *in camera*. It was addressed to Carol Hoffman and Sheila Wilson-Freeman, whom defendants identify as two of Morgan Stanley's in-house attorneys. (*Defendants' Motion for Protective Order Regarding Memorandum*, at 2). Ms. Jee's memo summarized the FMLA/retaliation portion of the investigation. The investigation involved review of personnel files and interviews with various levels of employees. The Memorandum discussed Ms. Robinson's medical leave, her job ratings, and job classifications. It addressed her interactions with co-workers and supervisors. The conclusion was, as already noted, that no retaliation had occurred. Basically, it provided in-house counsel with all the information they might need to determine how to address Ms. Robinson's vigorous charges of retaliation.

C.

The starting point for the resolution of a discovery dispute like this one is *Upjohn Co. v. United States*, 449 U.S. 383 (1981). There, an independent audit of a pharmaceutical corporation's foreign subsidiary uncovered payments to or for the benefit of foreign government officials in order to secure government business. The auditors informed the corporation's general counsel, who also served as its vice president. After consulting with outside counsel and the chairman of the board,

4

it was decided that the company would conduct an internal investigation of the payments. Along the way, attorneys prepared a letter containing a questionnaire which was sent to all foreign general and area managers over the chairman's signature. The letter noted the disclosure of possibly illegal payments to foreign government officials and emphasized that the management needed full information concerning any such payments.

It informed the recipient of the investigation and included a questionnaire detailed information regarding any such payments. The managers were instructed to treat the investigation as "highly confidential" and not to discuss it with anyone other than company employees who might be helpful in providing the requested information. Responses were to be sent directly to the general counsel. The general counsel, along with outside counsel, also interviewed the recipients of the questionnaire and 33 other officers or employees as part of the investigation. 449 U.S. at 386-87.

The corporation voluntarily submitted the report to the Securities and Exchange Commission and the Internal Revenue Service, disclosing the payments that were made. The IRS commenced its own investigation and subpoenaed all the files relevant to the corporate investigation, including the questionnaires and memoranda or notes on the interviews. The corporation refused to comply, citing the attorney-client privilege and the work product doctrine. 449 U.S. at 388. The Supreme Court ruled that the materials were, indeed, protected by the attorney-client privilege.

The Court explained that "[t]he communications at issue were made by [corporate] employees to counsel for [the corporation] acting as such, at the direction of corporate superiors in order to secure legal advice from counsel." 449 U.S. at 394. The point of the investigation was to put counsel – corporate and outside – in a position to provide legal advice to the company regarding the payments. *Id.* It did not matter whether the employees providing the information were

5

management or not. "Information, not available from upper-echelon management, was needed to supply a basis for legal advice concerning compliance with . . . laws . . . regulations . . . and potential litigation . . . .The communications concerned matters within the scope of the employees' corporate duties, and the employees themselves were sufficiently aware that they were being questioned in order that the corporation could obtain legal advice." *Id.* As for the work-product doctrine, the government conceded – "wisely," said the Court – that it applied to the memoranda and notes regarding the interviews. *Id.* at 397.

The situation here tracks *Upjohn* quite closely. There were questions about the legality of certain activities raised by an auditor – here, Ms. Robinson. The company, through its legal department, and along with an outside consulting firm, undertook an investigation that included interviews with employees. Outside accounting firms are often used for this sort of endeavor. *See e.g., United States v. Ruehle,* 583 F.3d 600, 607 (9th Cir. 2009). Everything was intended to be and was kept confidential. *Id.* Ms. Jee produced her memo at the request of in-house counsel and provided them with all the information that had been obtained regarding Ms. Robinson's complaint that she had been retaliated against for taking FMLA leave. It clearly was designed to allow the attorneys to provide that company with informed legal advice on the subject of her charges. There doesn't appear to be any reason why the attorney-client privilege should not apply to such a document.

The same goes for the work-product doctrine. The Memorandum can fairly be said to have been prepared in anticipation of litigation. In her responsive memorandum on the current motion, Ms. Robinson complained rather bitterly about what she considered retaliation in violation of FMLA. That's the kind of thing that will make an attorney's "antennae wriggle." *Mattenson v. Baxter*

*Healthcare Corp.*, 438 F.3d 763, 768 (7th Cir. 2006). It was an "articulable claim," the kind that's likely to lead to litigation. *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 977 (7th Cir. 1996); *Binks Mfg. Co. v. National Presto Indus. Inc.*, 709 F.2d 1109, 1120 (7th Cir. 1983). It doesn't matter that Ms. Jee is not an attorney. She prepared the memorandum at the direction of corporate counsel, specifically Mr. Oppenheim, who directed the investigation. *United States v. Smith*, 502 F.3d 680, 689 (7th Cir. 2007). Hence, it is a document prepared in anticipation of litigation and protected by the work-product doctrine. *EEOC v. Rose Casual Dining, L.P.*, 2004 WL 231287 at *4 (E.D.Pa. 2004).

### D.

Ms. Robinson argues that the Memorandum should not be protected because the application of the attorney-client privilege must be determined on a case-by-case basis. While true, the observation does not advance the analysis. The Supreme Court said as much in *Upjohn*, and that has always been the governing principle. And of course, there is Justice Holmes' famous aphorism, "[g]eneral propositions do not decide concrete cases." *Lochner v. New York*, 198 U.S. 45, 76 (1905)(Holmes, J., dissenting). But his dissent also recognized that general propositions can have informative capacity and the inescapable fact that they, of necessity, provide not only the starting point for analysis of a given set of facts, but may ultimately presage or dictate decision. Thus, immediately after noting the limitations of general propositions, Holmes said "[b]ut I think that the proposition just stated, if it is accepted, will carry us far toward the end." *Id.* And Justice Frankfurter, Holmes' most fervent acolyte, has said that "the intensity with which 'general propositions' are felt, and the flexibility with which they are enforced, do decide cases." Frankfurter,

*Mr. Justice Holmes and the Constitution: A Review of His 25 Years on the Supreme Court*, in Mr. Justice Holmes, p. 58 (Coward/McCann, Inc. 1931).

That is certainly the case with *Upjohn*. Ms. Robinson does not provide any insights into where she thinks the circumstances here deviate from those in *Upjohn*, which would prevent it from governing disposition of this case. Reviewing the Jee Memorandum and the circumstances of the investigation that produced it, it is clear that it is privileged under *Upjohn*.[3]

### E.

Ms. Robinson contends that there was a waiver when the defendants included a summary of their investigation as an exhibit to one of their filings in this case. The summary was also provided to Ms. Robinson to let her know how the defendants had responded to her memo. But this was nothing more than the disclosure of the fact that defendants conducted an investigation overseen by counsel and that counsel's conclusion was that Ms. Robinson's charges were unfounded. It was an "opaque" reference to attorney involvement that didn't reveal the substance of the underlying communications or analysis and thus does not constitute a waiver. *Libbey Glass, Inc. v. Oneida Ltd.*, 197 F.R.D. 342, 346-47 (N.D.Ohio 1999); *In re Brand Name Prescription Drugs Antitrust Litigation*, 1995 WL 531805, *2 (N.D.Ill. 1995)(no waiver where disclosures revealed nothing substantive about attorney-client communications, other than general direction on compliance with law); *In re Joy Global, Inc.*, 2008 WL 2435552, *5 (D.Del. 2008)(no waiver where disclosure revealed that attorney had been consulted and advised the client that particular benefits plan was

---

[3] For the same reasons, the general proposition that the privilege is to be strictly construed because it impedes the search for truth, *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009), does not mean that Ms. Robinson wins.

8

covered by ERISA) ; *In re Vecco Instruments, Inc. Securities Litigation*, 2007 WL 210110, *2 (S.D.N.Y. 2007)(no waiver where disclosures merely summarized findings and conclusions of internal investigation and did not quote, paraphrase or reference any of the specific documents at issue in support of its conclusions). It would be different if the entire investigative report were disclosed, thereby revealing detailed support for the ultimate conclusions. *In re OM Securities Litigation*, 226 F.R.D. 579, 592 (N.D.Ohio 2005). This is exactly what defendants are trying to guard against here. The little that was disclosed in the summary shared with Ms. Robinson does not amount to a waiver.[4]

Ms. Robinson also argues that the defendants waived whatever privilege they might have had by putting the human resources investigation at issue. In their fifth affirmative defenses, defendants claim they made good faith efforts to comply with anti-discrimination laws, and in their answer to paragraphs 48 and 65 of the first amended complaint, they alluded to their investigation and claimed it was unproductive and they denied that they "discharged the plaintiff without thoroughly investigating and/or acting un multiple complaints of retaliation against her before, during and after the investigation." But that doesn't amount to a waiver.

An implied waiver will occur if the holder of the privilege injects a new factual or legal issue into the case. *Lorenz v. Valley Forge Ins. Co.*, 815 F.2d 1095, 1098 (7th Cir.1987). Simply denying allegations doesn't amount to a waiver. Such a waiver usually occurs, if at all, when the holder asserts an affirmative defense. *Id.* The question is whether the holder of the privilege uses the privileged communications affirmatively to attack the other side's case. In *Nobles*, for example, the

---

[4] Ms. Robinson also submits that the defendants' privilege log was inadequate. But as the document in question was produced for *in camera* inspection, this is no longer an issue.

Supreme Court found that defendant waived its work-product privilege as to reports compiled by a defense investigator when the defense called that investigator to testify. The Court said that

> by electing to present the investigator as a witness, [defendant] waived the privilege with respect to matters covered in his testimony. Respondent can no more advance the work-product doctrine to sustain a unilateral testimonial use of work-product materials than he could elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination on matters reasonably related to those brought out in direct examination.

422 U.S. at 239-40. So here, a waiver would depend on whether the defendants make an affirmative use of the Jee memo in their case. *See In re Grand Jury Proceedings*, 219 F.3d 175, 191 (2nd Cir. 2000). *See also Fultz v. Federal Sign*, 1995 WL 76874, *2 (N.D.Ill. 1995)(" . . . if the investigation or its results is to be used as evidence at trial, then clearly the privilege which it enjoys would be waived."); *Barton v. Zimmer Inc.*, 2008 WL 80647, *9 (N.D.Ind. 2008)("'it is inconsistent for [the defendant] to invoke the *Faragher-Ellerth* defense but to retain the documents necessary to evaluate the sufficiency of its response as required by that defense.'"); *Walker v. County of Contra Costa*, 227 F.R.D. 529, 535 (N.D.Cal.2005).

So far, the defendants have denied Ms. Robinson's allegations that she was fired without a full investigation and they have said that they made good faith efforts to comply with anti-discrimination laws. In the first instance, they haven't placed anything in issue – Ms. Robinson has. In the second, the defendants are countering any claim Ms. Robinson might have for punitive damages. *See Bruso v. United Airlines, Inc.*, 239 F.3d 848, 857-58 (7th Cir. 2001).

The case law amply demonstrates the narrower proposition that the attorney-client privilege only prohibits a party from *simultaneously* using confidential information as both a shield and a sword.[5] In other words, "[a] defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes." *United States v. Bilzerian*, 926 F.2d 1285, 1292 (1991). Where an implied waiver is found, it occurs in the situation where "the party asserting the privilege placed information protected by it in issue through some affirmative act for its own benefit, and to allow the privilege to protect against disclosure of such information would have been manifestly unfair to the opposing party." *Pitney-Bowes, Inc. v. Mestre*, 86 F.R.D. 444, 447 (S.D.Fla.1980). That has not occurred here.[6]

## CONCLUSION

For the foregoing reasons, the defendants' motion for a protective order [#100 & #125] covering the Jee memo is GRANTED.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 3/17/10

---

[5] *See, e.g., Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir.2003); *Nguyen v. Excel Corp.*, 197 F.3d 200, 207 n. 18 (5th Cir.1999); *United States v. Workman*, 138 F.3d 1261, 1264 (8th Cir.1998); *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir.1991).

[6] I have reviewed the Jee Memorandum *in camera* and told Ms. Robinson that not only was it not helpful to her in any way, it could only adversely affect her. She has refused to accept that assessment, as she has the right to do.